UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MICHELE GILLEN,

                                Case No.

        Plaintiff,

vs.

CBS Television Stations Inc.,
WFOR-TV; WBFS-TV;
CBS BROADCASTING, INC.

        Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, Michele Gillen, by and through undersigned counsel, files her Complaint against the above named Defendants and alleges as follows:

1.      Plaintiff's action is an action for damages in excess of the jurisdictional minimum, exclusive of interest, costs, and attorneys' fees.

## PARTIES

2.      Plaintiff Michele Gillen is a resident of Miami, Florida.

3.      Defendants, CBS Television Stations, Inc., WFOR-TV, WBFS-TV, and CBS Broadcasting, Inc. (hereinafter referred to collectively as "CBS"), are Florida Foreign Corporations organized and existing under the laws of New York, and having their principal place of business located at 51 W 52nd Street, New York, NY 10019. CBS is the owner and operator of the WFOR-TV/WBFS-TV stations located at 8900 Northwest 18th Terrace, Miami, Florida 33172.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is appropriate pursuant to 28 U.S.C. § 1331, as it involves federal questions regarding the deprivation of Plaintiff's rights under the Age Discrimination in Employment Act of 1957 ("ADEA"), as amended, as well as Title VII of the Civil Rights Act of 1964, as amended, including section 2000e-3 [Section 704(a)] that prohibits retaliation against an employee.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred at CBS station WFOR-TV located in this district.

## COMPLIANCE WITH ADMINISTRATIVE PROCEDURES

6.      On December 13, 2016 Michele Gillen timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA").

7.      More than one hundred and eighty (180) days have expired since the time of filing and Plaintiff requested a Notice of Right to Sue on July 23, 2018.

8.      The EEOC issued a Right to Sue letter on August 17, 2018.

9.      Therefore Plaintiff has complied with and/or satisfied all conditions precedent prior to filing this claim against Defendant CBS.

## INTRODUCTION

10.     The culture of toxic misogyny exposed of late in Hollywood and national media outlets is and has been thriving at CBS.

11.     From the corporate headquarters in New York to the CBS owned and operated station WFOR-TV in Miami, CBS management and human resources ("HR") is entrenched in what can generously be described as the 'good ole boy's club' culture, which fosters misogyny, places men on a pedestal, elevates and protects men despite bad behavior, emboldens and protects bullies; and, often with the help of bullies, pushes women out who are beyond the age of forty (40).  Most endure the abuse as a cost of the pursuit of a successful career in journalism.  Those who dare to report it, even when following CBS protocol, pay the ultimate price.

12.     CBS HR, both in Miami and in the corporate headquarters in New York, has for more than a decade enabled abusers and facilitated abuse and discrimination, encouraging victims to ignore offensive behavior, and pressuring those that do come forward not to file formal complaints, all in direct contradiction to written anti-discrimination policies.

13.     Over time the atmosphere at the station has deteriorated into a hostile den of intimidation and disrespect, where even unaffected newsroom employees have commented about the publicly humiliating and degrading treatment of women over forty (40).  Male reporters have felt at liberty to degrade women in the news room by kicking over and stamping on work documents, pulling papers from their hands, and instructing female staff not to speak.

14.     The careers of an untold number of talented women at CBS have been extinguished, and those who report violations of CBS anti-discrimination policy, including reports to the CBS legal department in New York, face career ending retaliation.

<u>**COUNT I**</u>
<u>**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**</u>
<u>**GENDER DISCRIMINATION**</u>

15.     Plaintiff Michele Gillen ("Ms. Gillen") began working for CBS on May 28, 1995 as a staff newsperson, otherwise known as a reporter, or investigative reporter at the CBS owned

and operated station KCBS-TV in Los Angles, California, and she joined the CBS owned and operated station WFOR-TV in Miami on March 31st, 1997.

16.     Ms. Gillen was at all times material highly qualified for the position of investigative reporter.   During the last fifteen years Ms. Gillen has held the title Chief Investigative Reporter for CBS Miami.   She is the only female and the oldest of the three investigative reporters at WFOR-TV.   The two younger men remain at CBS.

17.     Throughout her nineteen year career at WFOR-TV/WBFS in Miami, Ms. Gillen was awarded twenty-five (25) NATAS Regional Suncoast Emmys.   During that time her work was nominated forty-six (46) times, she received consistent accolades from peers and the community, and has been credited with effectuating changes to public policy.   For example, her investigative series the Forgotten Floor was credited with the closure of what was considered one of the most inhumane jails that incarcerated the mentally ill in the country; her series The Silent Killer, exploring links between fire fighting and cancers, was credited with the allocation of 1.8 million dollars for research to the University of Miami; and Ms. Gillen's reporting on human trafficking was credited with the establishment of the Human Trafficking Academy at St. Thomas University School of Law.

18.      Ms. Gillen is a member of a protected class under Title VII.

19.     In public, CBS and WFOR-TV applauded her work and congratulated her journalistic contributions.

20.     Inside the walls of WFOR-TV, hidden from the public, the workplace was radically different.

21.     Notwithstanding Ms. Gillen's veteran status at WFOR-TV, she has been forced, for years, to fight to remain on the air in an extremely hostile work environment.

22.     Ms. Gillen was treated in a disparate and discriminatory manner compared to male employees as part of a pattern of discriminatory conduct.

23.     It was CBS's practice that news beats and projects developed by Ms. Gillen were ignored or taken from her to be worked on by younger reporters or male reporters, while she, in turn was assigned less desirable projects, and was given little to no support in producing the assigned projects.

24.     After reporting this discrimination to HR in Miami, Ms. Gillen was told "we must rely on the man upstairs" (God), and that "bad karma will catch up with the people doing this."

25.     CBS put a punitive, humiliating quota on Ms. Gillen's on-air investigative work, while simultaneously leaving the very managers whom Ms. Gillen had repeatedly reported as abusive and discriminatory in charge as gate-keepers, blocking her access to air time.

26.     CBS management also refused to assign work projects in subjects that she has a long track record of covering, such as reporting on the Vatican, the Papacy, including Pope John Paul the II, Pope Benedict XVI, and the election of Pope Francis. CBS refused resources, undermined work assignments, limited on-air time, and transferred desirable projects to junior male reporters who were directly elevated and were granted unlimited air time.

27.     After Ms. Gillen reported such discrimination by her news director Liz Roldan, whom Ms. Gillen also reported to human resources as a bully and abusive, Robin Bona, Senior Vice President of Human Resources New York, told Ms. Gillen "you can't claim discrimination, you have a female news director."  Such statements are an acknowledgement that CBS believes that having women in management insulates it from the requirements of the Civil Rights Act.

28.     Despite Ms. Gillen's veteran status at WFOR-TV, she was forced to personally fund the production of stories and specials to maintain on-air visibility and ensure the quality of

work, while competing with younger and/or male WFOR-TV reporters whom CBS provided ample resources. She personally paid for production assistants, camerapersons and editors, in order to balance the uneven playing field created by management while the two junior male colleagues in the investigative unit, Jim DeFede and David Sutta, easily obtained ample staff and resources and air time.

29.    Often after pitching projects, interviews, and investigations, Ms. Gillen was rejected by manager Cari Hernandez and news director Liz Roldan, only to find out later that some of the pitches were not in fact rejected, they were assigned to male and or younger reporters. She was also barred from high-profile assignments.

30.    By 2014, the hostility directed at Ms. Gillen by manager Hernandez, news director Roldan, and junior colleague Jim DeFede had become a common occurrence.

31.    The most egregious attack from Jim DeFede occurred at a special projects staff meeting in 2014, where DeFede began espousing false and humiliating accusations towards Ms. Gillen. Manager Hernandez, who was present at the meeting, did nothing to stop his antagonistic ranting.

32.    At this same meeting, in front of the same manager, DeFede disparaged female viewers of CBS, disdainfully declaring that he was done trying to figure out which of his stories will appeal and attract "women who are menstruating and watching Blue Bloods." Manager Hernandez did nothing, tacitly approving DeFede's open disparagement of women in general, and Ms. Gillen in particular.

33.    A female colleague who had been in the room described the attack and behavior directed at Ms. Gillen as being akin to cannibalization. The email is attached as Exhibit A. Later, Adam Levy the station's general manager admitted in an email that the humiliation Ms.

Gillen endured was an act in his mind that "is the most horrible of ways that people can feel." He added, "there is little else that can so powerfully effect people for the worst." He even likened it to what he believes gave rise to the Nazis. The email is attached as Exhibit B.

34.     Defede's emboldened behavior, uninterrupted by management, traumatized Ms. Gillen because she recognized that this was not a safe working environment. She was compelled to take a leave of absence, waiting for the CBS administration to hold DeFede, Hernandez and Roldan accountable (which did not happen), and upon her return she was forced into a punitive contract that contained, upon information and belief, an unprecedented mandatory quota that no other reporter at CBS has been forced into.

35.     The day she was to return to work, Ms. Gillen sent an email from home early in the morning to Sonia LaPaix, the Director of HR in Miami. In it she formally lodged a complaint of discrimination regarding the DeFede attack and the larger pattern and practice of abuse and discrimination at CBS.

36.     When she went into the station, she found out she had been removed as anchor from her public affairs show "Focus on South Florida." A colleague told her he couldn't believe they pulled the show from her and that Irika Sargent was going to anchor it.

37.      Ms. Gillen went straight to news director Liz Roldan's office and said "I guess you are aware that I filed a formal complaint for discrimination, I am aghast that a few hours later my show was taken from me. I consider this retaliation." Roldan's response: "God damn it, no one was supposed to tell you, no one can keep a secret in this newsroom. It is just a business decision for us. Don't take it personally. Nobody knows her (Irika), she is the new anchor, she needs the visibility." Management knew Irika Sargent was on a short track at the

station.  Despite this, management pulled Ms. Gillen for the younger female, who indeed left the station.

38.     Like Ms. Gillen, DeFede also had a show of his own, but his anchor position was never in jeopardy.

39.     Robin Bona of HR in New York was at the station in Miami some time thereafter and Ms. Gillen asked for a meeting with her to inquire about any investigation into the DeFede attacks on Ms. Gillen. Ms. Gillen explained to Bona that the environment became so toxic following her reporting DeFede and her managers that going to work made her sick.   Bona's response was "There was no policy-violation in there. Tempers flair." However, the only temper that flared was DeFede's.

40.     Ms. Gillen asked Bona if, during her absence, the only other non-management female employee in the staff meeting of six people had been interviewed because general manager Adam Levy had taken the male witnesses in the meeting out for coffee; the female employee was never interviewed, and nothing changed. The response received was "what would you like us to do, question 100 people?!"

41.     Ms. Gillen also told Bona of news director Liz Roldan criticizing, belittling, and downplaying her ideas for stories, even those that went on to win Emmys or be Emmy nominated.  This contrasted with the experience of her male colleague, Jim DeFede, who despite his bullying and harassment of Gillen, was getting on TV with even greater frequency.  Bona's response was: "Favoritism is not illegal."[1]

---

[1] HR so enabled bad boy behavior that misogyny ran rampant throughout the station.  For example, a male sales manager felt free to yell across the room to one of his male sales reps when deciding to set up a meeting with an outside female media buyer, "do we want to set up a meeting with [name omitted] today, or is she on the rag?"

42.     Ms. Gillen went back to work under the new punitive contract, and continued to personally fund the production of her award-nominated reporting to maintain on-air visibility and ensure the quality of her work, and never missed her quota.

43.     Each month efforts to get her stories on-air were thwarted, efforts to cover her regular beat, such as coverage of Pope Francis, were blocked, and rare interviews she offered were turned down by the news director.

44.     Meanwhile DeFede was favored, given disproportionate share of resources and support from management, with no check on his behavior.  DeFede's hostility towards Ms. Gillen never diminished.

45.     The disparate treatment extended to unchecked, frequent hostility by DeFede. Since 2014 any and all efforts made by Ms. Gillen to stop DeFede's harassment and bullying has been unabated, and instead DeFede was rewarded. He was given a series of half hour specials after his outburst and has all but in title replaced Ms. Gillen at WFOR-TV.

46.     One example occurred in October of 2015 in which manger Hernandez asked Ms. Gillen for access to a source Gillen cultivated for a story about how to identify a criminal.  Ms. Gillen asked for assurance that she would do the story and was told yes, and that she would get a producer, a rare circumstance.   Thereafter the truth came to light, the story and the producer were always intended for DeFede.

47.     By the acts described above and herein, including the imposition of a hostile work environment and the denial of work in favor of male colleagues, CBS discriminated against Ms. Gillen in the terms and conditions of her employment on the basis of her gender, in violation of Title VII.

48.     As the direct and proximate result of CBS's gender-based discrimination, Ms. Gillen has suffered and will continue to suffer monetary and/or economic damages, including, but not limited to, loss in past and future income, compensation and benefits, earning capacity, humiliation, mental anguish, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Ms. Gillen has suffered such monetary damages in an amount to be proved at trial and other relief.

**WHEREFORE**, Plaintiff, Michele Gillen, hereby demands a trial by jury and judgment against CBS as follows:

a.  for a money judgment representing all lost wages and all other sums of money;

b.  for a money judgment representing liquidated damages;

c.  for a money judgment representing all damages Ms. Gillen may avail herself of under this cause of action alleged as available;

d. for a money judgment representing prejudgment interest;

e. require CBS to reinstate Ms. Gillen to the position at the rate of pay and with the full benefits she would have had she not been discriminated against;

f.  that the Court retain jurisdiction over this action until CBS has fully complied with the Orders of this Court and that the Court require CBS to file such reports as may be necessary to supervise such compliance;

g.  reasonable attorneys' fees pursuant to 42 U.S.C. §2000e-5 (k) of Title VII, and punitive damages, as will effectuate the purpose of Title VII, together with all such other and further relief as the Court deems just and proper.

h. for such other and further relief as may be just and proper.

## COUNT II
## VIIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967
## (ADEA)

49.     Plaintiff Michele Gillen began working for CBS on May 28, 1995 as a staff newsperson, otherwise known as a reporter, or investigative reporter at the CBS owned and operated station KCBS-TV in Los Angles, California, and she joined the CBS owned and operated station WFOR-TV in Miami on March 31st, 1997.

50.     Ms. Gillen is a member of a protected class under Title VII, the Age Discrimination in Employment Act of 167, 29 U.S. C. §§ 631 *et seq.*;  Ms. Gillen is over forty (40) years of age.

51.     Age is not a bona fide occupational qualification reasonably necessary to the normal operation of Ms. Gillen's position.

52.     Ms. Gillen was at all times material highly qualified for the position of investigative reporter, and during the last fifteen (15) years Ms. Gillen has held the title Chief Investigative Reporter for CBS Miami.  She is the only female and the oldest of the three investigative reporters at WFOR-TV, the two younger men remain at CBS.

53.     Throughout her nineteen year career at WFOR-TV/WBFS in Miami, Ms. Gillen was awarded twenty-five (25) NATAS Regional Suncoast Emmys.  During that time her work was nominated forty-six (46) times, she received consistent accolades from peers and the community, and has been credited with effectuating changes to public policy.

54.     In public, CBS and WFOR-TV applauded her work and congratulated her journalistic contributions.

55.     Inside the walls of WFOR-TV, hidden from the public, the workplace was radically different.

56.     Notwithstanding Ms. Gillen's veteran status at WFOR-TV, she has been forced, for years, to fight to remain on the air in an extremely hostile work environment.

57.     She personally funded the production of stories and specials to maintain on-air visibility and ensure the quality of work, while competing with younger and or male junior WFOR-TV reporters whom CBS provided ample resources. She paid for production assistants, camerapersons and editors, in order to balance the uneven playing field created by management.

58.     Despite the existence of a CBS corporate-wide Non-Discrimination and Anti-Harassment Policy that each employee must review and acknowledge every year, Ms. Gillen has watched woman after woman over the age of forty (40) be subjected to discrimination in the form of abusive treatment, blocked opportunities and promotion, and watched them be systematically pushed out.  The women who were brave enough to express concerns to CBS HR asserting age discrimination and/or hostile work environment were unable to speak publicly due to fear of retribution.   When they went to HR they were met with resistance and questions such as "Are you sure you want me to write your complaint down and send it to New York?" Many, afraid, just walked away feeling helpless and trapped.  Some women resigned, some without other jobs, or signed confidentiality agreements.

59.     Ms. Gillen's efforts to stand up for herself and other women at WFOR-TV who suffered age and gender discrimination had no effect.  By 2016 most of her similarly situated female colleagues were either terminated or forced out of employment.

60.     When complaining to HR in Miami about discrimination against her, Ms. Gillen was often told "we must rely on the man upstairs", and that "bad karma will catch up with the people doing this."

61. Proof that this insidious pattern and practice of age discrimination was overtly directed at Ms. Gillen came on May 30, 2016, when Michele Gillen learned that her manager Cari Hernandez was making derogatory comments about her age to other employees. Staffers reported to Ms. Gillen that Hernandez and Roldan would criticize her, saying she was "old……fashioned."

62. On that date Ms. Gillen was shown a letter written by a senior cameraman Mr. Mohammed Hassan, who himself had filed an EEOC claim for age discrimination and hostile work environment.  This letter is attached as Exhibit C.

63. The letter had been given to CBS management and HR in Miami and to corporate headquarters in New York City, and included a testimonial of a conversation Mr. Hassan had with manager Hernandez.

64. The letter revealed that manger Hernandez told Mr. Hassan, referring to Michele Gillen, "I can't stand that old bitch." He was then ordered to "make her work, and make her work hard."

65. Mr. Hassan's revelation of manager Hernandez' demeaning statements evidenced the oppressive work environment.  Hernandez remains employed as a manager at WFOR-TV to this day.

66. On information and belief, neither WFOR-TV HR nor corporate HR conducted a proper investigation regarding Ms. Hernandez's statements concerning Ms. Gillen. Mr. Hassan subsequently filed suit and has reportedly settled with CBS.

67. At the time Mr. Hassan sent the letter to HR, it had, over a period of time, received complaints from Ms. Gillen, reporting that she was subjected to discrimination and a hostile work environment at the hands of manger Hernandez and news director Roldan.

68.     Yet, Ms. Gillen was never notified about the letter stating that her boss had called her an "old bitch," and thereafter, management kept her under the thumb of both Hernandez and Roldan.

69.     The atmosphere was poisoned from top management down. Ms. Gillen subsequently learned that a prior general manager who holds a prominent position at CBS today, made derogatory statements about Ms. Gillen's age to other staff with impunity.   In addition, the current general manager, Adam Levy, when speaking about applicants of a certain age, was known to say "why are you bringing me these Altacockers?"

70.     Increasingly, after pitching exclusive interviews and stories, Ms. Gillen was rejected by Hernandez and management and prohibited from airing them, only to find out that later they were re-assigned to male and or younger female reporters or staff, and rare interviews, the type that enhance her reputation as a journalist and provide tremendous peer and public attention for the TV station, were turned down. For example, in 2014, while on vacation in Italy, she secured an opportunity to do an exclusive interview with the captain of the Costa Concordia shipwreck.  News director Roldan told her to get back to her vacation.  In stark contrast, ten (10) years earlier, in 2004 during an earlier vacation in Italy, she got an opportunity to do an exclusive interview with Muammar Gaddafi in Libya.  She called her then news director and was told to go for it.

71.     Staff were also instructed to hide the fact that they were working specials with the male investigative reporters from Ms. Gillen.  Staff were told "don't tell Michele" and to shut their computers if Ms. Gillen walked in.

72.     The loss of her public affairs show "Focus on South Florida" in 2014 further diminished Ms. Gillen's on-air presence. This is especially true because Ms. Gillen would run

her in depth investigative pieces that were otherwise shortened or blocked by Hernandez and Roldan on Focus on South Florida.

73.     Additionally, the network altered Ms. Gillen's television segments to diminish her presence and ultimately erase her from the air while still under contract.  For example. the piece "The Human and Financial Cost of Florida's Heroin Epidemic"  Ms. Gillen was contacted for an exclusive story by the subjects that fueled this piece, fought to ride with the first responders and document in real time victims of the opioid crisis, and performed the work.  Yet, when the piece aired on October 27th and 28th, 2016, Ms. Gillen's voice was dubbed out and replaced by a younger female reporter. There was no trace of Michele Gillen.

74.     By the conduct described above, CBS has engaged in discrimination against Ms. Gillen because of her age and subjected her to age-based animosity.

75.     Such discrimination was based upon Ms. Gillen's age because she would not have been the object of discrimination but for the fact that Ms. Gillen is above the age of forty (40).

76.     CBS's conduct complained of herein was willful and in disregard of Ms. Gillen's protected rights.  CBS and its supervisory personnel were aware that discrimination on the basis of age was unlawful but acted in reckless disregard of the law.

77.     At all times material hereto, Ms. Gillen's direct manager Cari Hernandez, the news director Liz Roldan, and general manager Adam Levy exhibited discriminatory conduct towards Ms. Gillen.

78.     CBS HR and CBS corporate management retained the above-referenced employees who exhibited the discriminatory conduct toward Ms. Gillen and did so despite the knowledge of said employees engaging in discriminatory actions.

79.     The conduct of CBS, by and through the conduct of its agents, employees, and/or representatives, and CBS's failure to make prompt remedial action to prevent continued discrimination against Ms. Gillen, violates the provisions of the Age Discrimination In Employment Act ("ADEA"), as amended, 28 U.S.C. § 621, *et seq.*

80.     By the acts and practices described above and herein, CBS unlawfully discriminated against Ms. Gillen, a female employee over the age of forty (40), in the terms and conditions of her employment on the basis of her age.

81.     As a direct and proximate result of CBS's actions Ms. Gillen has suffered and will continue to suffer monetary and/or economic damages, including, but not limited to, loss in past and future income, compensation and benefits, earning capacity, humiliation, mental anguish, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Ms. Gillen has suffered such monetary damages in an amount to be proved at trial and other relief.

82.     CBS's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard for Ms. Gillen's rights.

**WHEREFORE**, Plaintiff, Michele Gillen, hereby demands a trial by jury and judgment against CBS as follows:

a.  for a money judgment representing all lost wages and all other sums of money;

b.  for a money judgment representing liquidated damages;

c.  for a money judgment representing all damages Ms. Gillen may avail herself of under this cause of action alleged as available;

d. for a money judgment representing prejudgment interest;

e. require CBS to reinstate Ms. Gillen to the position at the rate of pay and with the full benefits she would have had she not been discriminated against;

f. for the cost of the suit, including an award of attorney's fees pursuant to 42 U.S.C. § 1988, the Civil Rights Attorneys Fee Award Act;

g. for such other and further relief as may be just and proper, and requests that the Court retain jurisdiction over this action until CBS has fully complied with the Orders of this Court and that the Court require CBS to file such reports as may be necessary to supervise such compliance.

### COUNT III
### VIOLATION OF SECTION 704(a) OF THE CIVIL RIGHTS ACT OF 1964
### PROHIBITING RETALIATION

83.    Plaintiff Michele Gillen began working for CBS on May 28, 1995 as a staff newsperson, otherwise known as a reporter, or investigative reporter at the CBS owned and operated station KCBS-TV in Los Angles, California, and she joined the CBS owned and operated station WFOR- TV in Miami on March 31st, 1997.

84.    Ms. Gillen was at all times material highly qualified for the position of investigative reporter.  During the last fifteen years Ms. Gillen has held the title Chief Investigative Reporter for CBS Miami.

85.    Throughout her nineteen year career at WFOR-TV/WBFS in Miami, Ms. Gillen was awarded twenty-five (25) NATAS Regional Suncoast Emmys.  During that time her work was nominated forty-six (46) times, she received consistent accolades from peers and the community, and has been credited with effectuating changes to laws.

86.    Ms. Gillen is a member of a protected class under Title VII.

87.     For years, Ms. Gillen consistently followed the rules and policies to report discrimination and the hostile work environment to HR at WFOR-TV and CBS corporate headquarters in New York, and supported and fearlessly advocated for other women at the station who were suffering sex and age discrimination.  There has been and continues to be a litany of complaints by employees that have been filed with CBS in Miami and New York City; however CBS human resources is an impotent charade that allows continued intimidation of employees who dare to report abuse.

88.     Ms. Gillen's previous efforts to bring age and sex discrimination to the attention of CBS HR, at both in Miami and at the corporate offices were dismissed.  There was no change in the hostile work environment at WFOR-TV.

89.     In 2010 Ms. Gillen sought help from the then general manager about gender discrimination and bullying from her manager, who was a woman.  The general manager contacted HR and the legal department at the corporate level in New York.  Ms. Gillen was promised she would never be the subject of bullying again, and would never have to work in a hostile working environment again.  The misogynistic culture never corrected the problems or adhered to its own work place procedures, and the "boys club" culture was never addressed and allowed to foment. Management shrugged it off, saying it's just "bad boy behavior."

90.     Then, on September 30, 2016, Ms. Gillen was blindsided.

91.     She had just recently returned from an approved unpaid family leave of approximately two weeks under the Family Medical Leave Act (FMLA) in which she was taking care of her ailing mother suffering the last stages of Alzheimer's disease when she was called and told she was needed at the station to cover potential breaking news.

92.     Minutes after arriving, she was ordered to see general manager Adam Levy in his office where he stated: "This is your last day." Ms. Gillen had to press and push for a reason why.  She was told, "We reviewed your salary and output and have decided to eliminate your position." Aware that there were three investigative reporters, Ms. Gillen asked "exactly what position is being eliminated?"  Levy refused to answer why the only woman of the three investigative reporters was eliminated, and the two others, both male, remained.    Ms. Gillen asked why they didn't offer her a lower salary.  Mr. Levy said "I'm not going to answer that." Finally, he said, "We don't want you working here anymore."

93.     The explanation for her firing was a ruse.  Ms. Gillen was in fact fired in retaliation for reporting discrimination in violation of Title VII.

94.     Her male counterparts continued in their positions, only Ms. Gillen was eliminated, not her position.

95.     Thereafter projects Ms. Gillen had been working on were aired and fronted by investigative reporters Jim DeFede, David Sutta, or young female reporters, with Ms. Gillen's voice and face erased.

96.     Five of the eight Emmy nominations received by WFOR-TV in 2016 were for Michele Gillen's work.

97.     Since Ms. Gillen's departure, new females over forty (40) that have appeared on the air at WFOR-TV have been per diem hires, with no commensurate salaries or benefits.

98.     As a direct and proximate result of CBS's retaliatory actions Ms. Gillen has suffered and will continue to suffer monetary and/or economic damages, including, but not limited to, loss in past and future income, compensation and benefits, earning capacity, humiliation, mental anguish, emotional distress and damage to reputation.  As a result of those

actions and consequent harms, Ms. Gillen has suffered such monetary damages in an amount to be proved at trial and other relief.

WHEREFORE, Plaintiff, Michele Gillen, hereby demands a trial by jury and judgment against CBS as follows:

   a.  for a money judgment representing all lost wages and all other sums of money;

   b.  for a money judgment representing liquidated damages;

   c.  for a money judgment representing all damages Ms. Gillen may avail herself of under this cause of action alleged as available;

   d. for a money judgment representing prejudgment interest;

   e. require CBS to reinstate Ms. Gillen to the position at the rate of pay and with the full benefits she would have had she not been discriminated against;

   f.  that the Court retain jurisdiction over this action until CBS has fully complied with the Orders of this Court and that the Court require CBS to file such reports as may be necessary to supervise such compliance;

   g. for the cost of the suit, including an award of attorney's fees pursuant to 42 U.S.C. § 1988, the Civil Rights Attorneys Fee Award Act;

   h. for such other and further relief as may be just and proper.

## COUNT IV
## RETALIATION IN VIOLATION OF CHAPTER 760, F.S.

99.     This is an action for damages for violation of Chapter 760, Florida Statutes, the Florida Civil Rights Act.

100.    The acts alleged in this Complaint constitute a violation of Section 760.10(7), Florida Statutes.  The statute states, "[i]t is an unlawful employment practice for an employer . . .

to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted in any manner in an investigation, proceeding, or hearing under this section."

101.    CBS's actions as described in Counts I-III constitute a violation of Section 760.10, Florida Statutes, which makes it unlawful for an employer to "discriminate against any person because that person has opposed any practice which is an unlawful employment practice or because that person has made a charge [of discrimination pursuant to Section 760.10, Florida Statutes.]"

102.    As retaliation for reporting age and gender discrimination, CBS subjected Ms. Gillen to a punitive contract containing a mandatory quota for on-air stories, and ultimately fired her.

103.    As a direct and proximate result of CBS's retaliatory actions Ms. Gillen has suffered and will continue to suffer monetary and/or economic damages, including, but not limited to, loss in past and future income, compensation and benefits, earning capacity, humiliation, mental anguish, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Ms. Gillen has suffered such monetary damages in an amount to be proved at trial and other relief.

**WHEREFORE**, Plaintiff, Michele Gillen respectfully requests this Court to enter judgment in her favor and against CBS, awarding her damages for back pay, front pay, loss of benefits, consequential damages, compensatory damages to the extent permitted by law, prejudgment and post-judgment interest, reasonable attorneys' fees and all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable as a matter of right.

Dated this 14th day of September, 2018.

Respectfully submitted,

By:  s/ Louise R. Caro
Louise R. Caro, Esq. FBN 633380
Marie Napoli, Esq. (*pro hac pending*)
**NAPOLI SHKOLNIK PLLC**
***Attorneys for Plaintiff***
2665 South Bayshore Drive
Suite 220
Coconut Grove, Florida 33133
Tel: (786) 837-5442
Fax: (786) 441-2140
E-mail: lcaro@napolilaw.com
E-mail: jpino@napolilaw.com

By:      / s/  Louise R. Caro
         Louise R. Caro, Esq.
         Florida Bar No. 0633380